NO. 11-50417

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

____
____

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**SALVADOR HERNANDEZ-ESTRADA,**

Defendant-Appellant.

____
____

Appeal from the United States District Court
for the Southern District of California
Honorable Barry Ted Moskowitz, District Judge Presiding

____
____

**APPELLANT'S OPENING BRIEF**

____
____

MICHELE A. McKENZIE
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BAIL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . 2

    (1)    Whether disproportionately disqualifying Hispanic citizens from jury service by screening for English proficiency based on the law as it existed in 1948 -- and not as it exists today -- is a substantial violation of the Jury Selection and Service Act of 1968 ["Jury Act"] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    (2)    Whether allowing unsupervised jury clerks to disqualify U.S. citizens from jury service based on an incorrect standard of law is a substantial violation of the Jury Act . . . . . . . . . . 2

    (3)    Whether failing to return "Juror Qualification Questionnaires" to prospective jurors who have not indicated their race/ethnicity, as required by statute -- making it impossible to get an accurate picture of the racial and ethnic composition of the master and qualified wheels -- is a substantial violation of the Jury Act . . . . . . . . . . . . . . . . . . . . . 3

    (4)    Whether failing to complete the required form AO-12, "Report on Operation of the Jury Selection Plan" and failing to regularly monitor the representativeness of the jury wheels as required, except in response to pending litigation, are substantial violations of the Jury Act . . . . . . . . . . . . . . 3

i

(5)    Whether failing to supplement the source list from which potential jurors are selected when those lists indisputably underrepresent African-American and Hispanic citizens is a violation of the Jury Act, the equal protection component of the Fifth Amendment, and the fair cross section guarantee of the Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PERTINENT STATUTORY AND CONSTITUTIONAL PROVISIONS . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    The Southern District of California Screens Potential Jurors for English Proficiency Based on the Federal Qualification Statutes as They Existed in 1948, Not as They Exist Today, and Thereby Over-excludes Hispanic Citizens from Jury Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

a.    The Southern District's jury wheel data from 1999 through 2009 shows that Hispanic citizens are more likely to be removed from consideration for jury service through the qualification process than non-Hispanic citizens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

b.    A review of the "Juror Qualification Questionnaires" returned by prospective jurors shows this erroneous language is causing qualified Hispanic citizens to be wrongly excluded from federal jury service . . . . . . . . . . . . . . 15

ii

i.    The Jury Act requires that jurors not be "unable to speak the English language." Is this the same as requiring a juror speak English "well," "very well," "100%," "fluently" or requiring a juror have "full knowledge of legal terms"? . . . . . . . . . . . . . . . . . . . . . . 17

c.    Is the questionable disqualification of 1,420 Hispanic citizens from jury service based on an incorrect legal standard a substantial violation of the Jury Act? . . . . . . . . . . 22

II.    The Southern District of California Is Failing to Properly Supervise the Clerk's Office in the Administration of the Jury Qualification Process and Hispanic Citizens Who Answer "Yes" to Question 4 Are Also Being Improperly Disqualified from Jury Service If They Express Any Hesitation about Their English Language *Fluency* . . . . . . . . . . . . . . 25

III.    The Failure to Return "Questionnaires" to Jurors Who Omit Required Information on Race/Ethnicity Violates 28 U.S.C. § 1864(a) and Renders It Impossible to Achieve an Accurate View of the Racial and Ethnic Composition of the Master and Qualified Wheels . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

a.    The Jury Act was amended in 1972 to require potential jurors to provide race/ethnicity information so that reliable information to reveal and remedy discrimination would be available . . . . . . . . . . . . . . . . . . . . . 32

b.    Even though the Jury Act requires that "Questionnaires" be returned where "there is an omission . . . in a form," the clerk's office fails to return those forms missing information on race/ethnicity, so no reliable information is maintained to monitor and enforce non-discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iii

c.   Despite the plain language of the Jury Act, the district court erroneously abdicated its judicial function to the Administrative Office of the U.S. Court's interpretation of the Jury Act in determining there was no need to return "Questionnaires" omitting information despite Congress's unequivocal intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

d.   The failure to return "Questionnaires" omitting race/ethnicity information had real, detrimental effects on Mr. Hernandez-Estrada's ability to present the district court -- and this Court -- with accurate data to evaluate his statutory and constitutional claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.  The Southern District's Repeated Failure to Monitor Jury Representativeness Unless Prompted to by Pending Litigation Is Contrary to the Explicit Instructions of the Administrative Office of the U.S. Courts, the Judicial Conference of the United States, 28 U.S.C. § 1863(a), and the Very Spirit of the Jury Act Aimed at Ending Discrimination in Federal Jury Service . . . . . . . . . . . . . . . . . . . . . . . 42

a.   The timing of the 1999, 2001, and 2003 AO-12's strongly suggests they were filled out only in response to litigation in the *United States v. Martinez-Orosco* case, and not upon the refilling of the master wheel as required . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

b.   The 2005 and 2007 AO-12's were also not completed upon the refilling of the master wheel, again suggesting that they were filled out in response to litigation in the *United States v. Garcia-Arellano* case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      c.    The 2009 AO-12 seems to have been issued as a knee-jerk response to the district court's order in the *Garcia-Arellano* case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      d.    The failure to fill out the AO-12's unless and until prompted to by pending litigation highlights the fact that no one in the Southern District is evaluating if the master and qualified wheels are fair cross sections of the community until it's far too late to do anything about the persistent underrepresentation . . . . . . . . 47

V.    The Southern District's Exclusive Use of a Juror Source List That Substantially and Persistently Underrepresents African-American and Hispanic Citizens Violates the Jury Act, the Equal Protection Component of the Fifth Amendment, and the Fair Cross Section Guarantee of the Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      a.    African-American and Hispanic citizens in California are substantially underrepresented on registered voter lists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      b.    A substantial portion of the voting eligible population of San Diego and Imperial Counties has not been registered to vote from at least 2000 and continuing through 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

          i.    Given our Nation's history of discrimination against minorities in the voting process, one cannot equate failure to register to vote with a failure to be engaged -- or desire to be engaged -- in civic life . . . . . . . . . . . . . . . . . . . . . . . . . . 58

c.     The Ninth Circuit's Jury Trial Imrovement Committee recommended supplementation of jury source lists because jury-eligible citizens are underregistered to vote and because voter registration lists are not representative of the community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

d.     Failure to supplement unrepresentative source lists violates not only the Jury Act but the Fifth and Sixth Amendments as well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

i.     Hispanics and African-Americans are "recognizable and distinct" and "'distinctive' group[s] in the community." . . . . . . . . . . . . . . . . . . . . . 63

ii.     The failure to collect reliable race/ethnicity data makes it impossible for this Court to evaluate the second prong . . . . . . . . . . . . . . . . . . . . . . 64

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CERTIFICATE OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

PROOF OF SERVICE

vi

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Castaneda v. Partida*,
  430 U.S. 482 (1977) ........................................................................ 63

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ................................................................. 37, 38

*Duren v. Missouri*,
  439 U.S. 357 (1979) ........................................................................ 63

*Garcia v. Holder*,
  659 F.3d 1261 (9th Cir. 2011) ..................................................... 37

*Hirst v. Gertzen*,
  676 F.2d 1252 (9th Cir. 1982) ..................................................... 64

*Taylor v. Louisiana*,
  419 U.S. 522 (1975) ........................................................................ 46

*United States v. Cannady*,
  54 F.3d 544 (9th Cir. 1995) ......................................................... 63

*United States v. Erickson*,
  75 F.3d 470 (9th Cir. 1996) ............................................... 9, 22, 23

*United States v. Nelson*,
  718 F.2d 315 (9th Cir. 1983) ....................................................... 22

*United States v. Rodriguez-Lara*,
  421 F.3d 932 (9th Cir. 2005) ................................... 8, 39, 40, 41

*United States v. Santos*,
  588 F.2d 1300 (9th Cir. 1979) ..................................................... 23

*United States v. Sanchez-Lopez*,
      879 F.2d 541 (9th Cir. 1989) ...................................................... 63

*United States v. Suttiswad*,
      696 F.2d 645 (9th Cir. 1982) ...................................................... 64

## DISTRICT COURT CASES

*United States v. Martinez-Orosco*,
      No. 03cr2601-JAH (S.D. Cal.) ..................................................... 44

*United States v. Garcia-Arellano*,
      No. 08cr2876-BTM (S.D. Cal.) ............................................... 4, 45

## UNITED STATES CONSTITUTION

U.S. CONST. amend. V ....................................................................... 62
U.S. CONST. amend. VI ................................................................. 52, 62

## FEDERAL STATUTES

8 U.S.C. § 1326 ................................................................................... 1
8 U.S.C. § 1423 ........................................................................... 14, 15
18 U.S.C. § 3231 ................................................................................. 1
28 U.S.C. § 1291 ................................................................................. 1
28 U.S.C. § 1294(1) ............................................................................ 1
28 U.S.C. § 1861 ................................................ 10, 42, 52, 55, 56, 65
28 U.S.C. § 1862 ............................................................................... 42
28 U.S.C. § 1863 ..................................................................... 42, 46, 55
28 U.S.C. § 1864 ......................................................................... *passim*
28 U.S.C. § 1865 ......................................................................... *passim*
28 U.S.C. § 1867 ......................................................................... 9, 22
28 U.S.C. § 1869 ................................................................... 32, 33, 34
42 U.S.C. § 1973gg-1 to gg-10 ......................................................... 58

# CONGRESSIONAL REPORTS

S. Rep. No. 92-1144 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3402
.......................................................................................... 30, 32, 33, 35

H.R. Rep. No. 90-1076 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792
........................................................................................... 31, 42, 51, 54

H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N 2437 ................... 57

# JUDICIAL REPORTS

Ninth Circuit Jury Trial Improvement Committee, *First Report on Goals and Recommendations* (May 2004) ..................................................... 49

*Report of the Proceedings of the Judicial Conference of the United States* (September 22-23, 1982) ............................................................ 43

*Report of the Judicial Conference Committee on the Operation of the Jury System*, 26 F.R.D. 409 (1960) ....................................................... 10, 11, 12

# MISCELLANEOUS

Arthur R. Cresce, Audrey Dianne Schmidley, and Roberto R. Ramirez, *Identification ofHispanic Ethnicity in Census 2000: Analysis of Data Quality for the Question on Hispanic Origin* (U.S. Census Bureau, Population Division Working Paper No. 75) ............................................. 34

Douglas R. Hess & Scott Novakowski, *Unequal Access: Neglecting the National Voter Registration Act 1995-2007* (February 2008) .................... 59

C. Williams, *Jury Source Representativeness and the Use of Voter Registration Lists,* 65 N.Y.U. L. REV. 590 (1990) ......................................................... 57

*'Motor Voter' Program Broke Down*, L.A. TIMES, June 23, 2001, at A-11 ........ 59

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.C.A. No. 11-50417 |
| | ) | U.S.D.C. No. 10CR0558-BTM |
| Plaintiff-Appellee, | ) | |
| v. | ) | |
| | ) | |
| SALVADOR HERNANDEZ-ESTRADA, | ) | |
| | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## STATEMENT OF JURISDICTION

Mr. Hernandez-Estrada appeals his conviction following a jury trial for a violation of 8 U.S.C. § 1326. The district court had original, subject-matter jurisdiction under 18 U.S.C. § 3231.[1] This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 & 1294(1).[2]

The district court entered a final judgment on October 3, 2011.[3] CR 139; ER 1-19. Mr. Hernandez-Estrada filed his notice of appeal the next day, October 4, 2011.[4]

---

[1] 9th Cir. R. 28-2.2(a).

[2] 9th Cir. R. 28-2.2(b).

[3] 9th Cir. R. 28-2.2(c).

[4] FED. R. APP. P. 4(b)(1)(A)(i).

CR 140; ER 43-44. On October 24, 2011, the district court issued an amended

judgment correcting the spelling of Mr. Hernandez-Estrada's first name. CR 143;

ER 39-42.

## BAIL STATUS[5]

Mr. Hernandez-Estrada is serving a 37-month sentence in the custody of the

U.S. Bureau of Prisons. His projected release date is August 15, 2012.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

This appeal presents the following issues for review:

(1) Whether disproportionately disqualifying Hispanic citizens from jury service by screening for English proficiency based on the law as it existed in 1948 -- and not as it exists today -- is a substantial violation of the Jury Selection and Service Act of 1968 ["Jury Act"];

(2) Whether allowing unsupervised jury clerks to disqualify U.S. citizens from jury service based on an incorrect standard of law is a substantial violation of the Jury Act;

(3) Whether failing to return "Juror Qualification Questionnaires" to prospective jurors who have not indicated their race/ethnicity, as required by statute -- making it impossible to get an accurate picture of the racial and ethnic composition of the master and qualified wheels -- is a substantial violation of the Jury Act;

---

[5] 9th Cir. R. 28-2.4(a).

2

(4)    Whether failing to complete the required form AO-12, "Report on Operation of the Jury Selection Plan" and failing to regularly monitor the representativeness of the jury wheels as required, except in response to pending litigation, are substantial violations of the Jury Act; and

(5)    Whether failing to supplement the source list from which potential jurors are selected when those lists indisputably underrepresent African-American and Hispanic citizens is a violation of the Jury Act, the equal protection component of the Fifth Amendment, and the fair cross section guarantee of the Sixth Amendment.

## PERTINENT STATUTORY AND CONSTITUTIONAL PROVISIONS

Mr. Hernandez-Estrada has attached an addendum including the statutory and constitutional provisions pertinent to his issues raised on appeal.  9th Cir. R. 28-2.7.

## STATEMENT OF FACTS

On June 4, 2010, Mr. Hernandez-Estrada filed a motion in the district court seeking the opportunity to review "Juror Qualification Questionnaires" of persons on the master jury wheel in anticipation of a challenge to the jury selection procedures in the Southern District of California.  CR 13.  The district court granted his motion on July 21, 2010.  CR 18.  On November 10, 2010, Mr. Hernandez-Estrada filed motions detailing violations of the Jury Selection and Service Act of 1968, the equal protection component of the Fifth Amendment, and the fair cross section guarantee of the Sixth Amendment in the Southern District's juror selection procedures.  CR 41.

3

After a hearing, the district court issued a written order on March 25, 2011, finding

that the Southern District may have violated several provisions of the Jury Act by:

> (1) using "outdated" language to screen potential jurors for English-language proficiency;   ER 7 & 12.

> (2) having jury clerks -- not the court -- disqualify prospective jurors from the qualified wheel when there were no bases for disqualification indicated on their "Juror Qualification Questionnaires;"  ER 12.

> (3) failing to return "Juror Qualification Questionnaires" to prospective jurors who didn't state their race/ethnicity; ER 14-16.

> (4) failing to fill out the AO-12, "Report on Operation of the Jury Selection Plan" in a timely manner; ER 17.

but then concluded that these were "technical" and not "substantial" violations of the

Jury Act.   CR 98; ER 12, 13, 15 & 17.   As to certain arguments raised by

Mr. Hernandez-Estrada, the district court incorporated an earlier opinion it wrote in

the case of *United States v. Jose Garcia-Arellano*, No. 08cr2876 (S.D. Cal. June 9,

2009), which raised many of the same issues.[6]  ER 4.  The court's order in *Garcia-*

*Arellano* is included in the Excerpts of Record, because it was incorporated by the

district court in its ruling on Mr. Hernandez-Estrada's motions.  ER 20-38.

Prior to trial, Mr. Hernandez-Estrada once again objected to the jury selection

procedures, now as pertained to the petit jury that was about to hear his case.  CR 110;

---

[6]  The indictment in *Garcia-Arellano* was dismissed by the Government after Mr. Garcia-Arellano's motion for new trial was granted by the district court.

4

ER 51.  He was convicted following a jury trial on April 14, 2011.  CR 114.  The district court entered judgment against Mr. Hernandez-Estrada on October 3, 2011, and sentenced him to 37 months' custody.  CR 139; ER 45-48.  This appeal follows.

## SUMMARY OF THE ARGUMENT

The parties and the district court agree that prospective jurors in the Southern District of California are being screened for English-language proficiency based on the federal juror qualification statutes as they existed in 1948, not as they exist today.  As a result, Hispanic citizens have been disqualified from jury service at a greater rate than non-Hispanic citizens for each Southern District jury wheel over the last decade.

Hispanic citizens who are educated and gainfully employed in the community are being erroneously disqualified from jury service solely on the basis of their answers to the outdated English-language proficiency question.  For example, Hispanic citizens who express concern that they do not "feel fluent in legal matters or issues" or that do not speak or write English "100%" are being disqualified from jury service and never placed into the qualified wheel from which jurors are selected, even though the federal jury statutes require neither fluency "in legal matters or issues" nor the ability to speak and write English "100%."  Disqualifying potential jurors based on an incorrect standard of law -- a procedure disproportionately affecting Hispanic

citizens -- undermines the fair cross sectional goal and equal protection guarantee of the Jury Act and is a substantial violation of the Act.

In the Southern District, jury clerks and the jury administrator -- not the district court -- are deciding whether potential jurors are qualified for federal jury service. The Jury Act permits determinations about juror qualifications to be made by "the chief judge of the district court," another designated "district court judge," or "the clerk under supervision of the court." It does not allow unsupervised, non-Article III court employees to disqualify potential jurors. In the Southern District, Hispanic citizens who have answered every qualification question in a manner that indicates they are statutorily qualified for federal jury service are nonetheless being excluded from the qualified wheel if they include "Remarks" on their "Juror Qualification Questionnaire" advising the court they may not know "legal terms," aren't completely "fluent," or don't "read and write very well." Again, federal law does not require jurors to know "legal terms," to be completely "fluent," or to read and write English "very well." Nevertheless, unsupervised jury clerks are erroneously disqualifying these Hispanic citizens from jury service.

The Jury Act requires district courts to collect race and ethnicity information on the "Juror Qualification Questionnaire" to enable the courts to monitor the representativeness of their jury pools. The clerk's office fails to return

6

"Questionnaires" to prospective jurors who omitted their race/ethnicity even though the Jury Act requires any "Questionnaires" omitting information be returned to the prospective juror to be completed. The failure to return these "Questionnaires" for completion makes it impossible to know the true demographics of the Southern District's jury wheels and impossible for Mr. Hernandez-Estrada (or any defendant) to make the necessary statistical showing of underrepresentation for his statutory and constitutional claims.

The Jury Act also requires district courts to regularly compile reports on the racial and ethnic make-up of their jury wheels and to compare that data to the racial and ethnic demographics of the community to see if they are achieving the Jury Act's fair cross sectional goal. The Southern District has a history of only compiling this data when litigation is pending and not as a means to monitor its compliance with the Jury Act. The failure to regularly fill out these demographic reports as required by law means the Southern District has failed to catch and remedy a decade of unrepresentative jury wheels.

At any given time over the last ten years, between 23-41% of the eligible community in the Southern District of California has not been registered to vote. Those members of the community who are registered to vote are disproportionately non-Hispanic, white citizens; African-American and Hispanic citizens are

7

underrepresented on registered voters lists compared to their presence in the community year after year. The Southern District relies exclusively on these unrepresentative voter registration lists in identifying persons for federal jury service and thus has grand and petit juries that underrepresent African-American and Hispanic citizens. The failure of the Southern District to supplement their indisputably underrepresentative jury source list is a violation of the Jury Act, the equal protection component of the Fifth Amendment, and the fair cross section requirement of the Sixth Amendment.

## STANDARD OF REVIEW

This Court reviews the statutory and constitutional issues presented in this appeal "independently and non-deferentially" to the findings of the district court. *United States v. Rodriguez-Lara,* 421 F.3d 932, 939 (9th Cir. 2005) (internal quotations and citation omitted).

As to the statutory claims, if this Court determines there has been a violation of the Jury Act after its "independent[] and non-deferential[]" review, the inquiry does not end there. This Court must then determine if the violation is "technical" or "substantial." The Jury Act provides a remedy only for "substantial" violations. 28 U.S.C. § 1867(d). A "substantial" violation is one which frustrates "the Act's goals of obtaining jury lists that are a cross-section of the community, allocating jury

8

duty fairly among the citizenry, and determining disqualifications, excuses, exemptions and exclusions on the basis of objective criteria only." *United States v. Erickson*, 75 F.3d 470, 477 (9th Cir. 1996) (citations omitted).

## ARGUMENT

**I.     The Southern District of California Screens Potential Jurors for English Proficiency Based on the Federal Qualification Statutes as They Existed in 1948, Not as They Exist Today, and Thereby Over-excludes Hispanic Citizens from Jury Service.**

Prior to the passage of the Jury Selection and Service Act of 1968,[7] qualifications for federal jury service were set out in 28 U.S.C. § 1861 (not § 1865, as they are now).  With regard to English proficiency, that section stated that an otherwise eligible person would be disqualified if, "[h]e is unable to read, write, speak, and understand the English language."  28 U.S.C. § 1861 (1948).  This section was revised in 1957, but the language regarding English proficiency remained the same.  28 U.S.C. § 1861 (1957).   But when Congress passed the Jury Selection and Service Act of 1968, it changed the English language requirement.   The new

---

[7]  The passage of the Jury Act represented a substantial overhaul of the entire federal juror qualification and selection process.  Prior to 1968, there were statutes dealing with the qualification of federal jurors, but they were by no means as comprehensive as the Jury Act.  For over a 150 years, the federal juror statutes essentially adopted the same qualifications as the states in which the district courts were located, often thereby excluding women and minorities from jury service in many federal courts.  The Judicial Conference of the United States' Committee on the Operation of the Jury System worked for many years researching jury practices in the federal courts and recommending improvements to that system. For a detailed history of the federal juror qualification statutes dating to 1789, see the *Report of the Judicial Conference Committee on the Operation of the Jury System*, 26 F.R.D. 409, 443-45 (1960).

requirement was -- and is -- that a person otherwise eligible to serve on grand and petit juries in the district court would be disqualified only if he:

> (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form; [or]

> (3) is unable to speak the English language.

28 U.S.C. § 1865(b)(2)-(3).

While Congress changed the English language requirement in 1968, Question 4 on the Southern District's "Juror Qualification Questionnaire" has never been updated. ER 253. The language used in Question 4 originated in a report by the Judicial Conference Committee on the Operation of the Jury System (discussed below) -- a report predating the 1968 Jury Act itself.

In 1960, the Judicial Conference Committee on the Operation of the Jury System issued a report on a number of jury-related topics, including the use of a questionnaire to screen potential jurors (as opposed to a personal interview). *See Report of the Judicial Conference Committee on the Operation of the Jury System*, 26 F.R.D. 409, 435-40 (1960). Attached to that report, the Committee included as an exhibit a "sample questionnaire" for district courts to use in screening jurors. *Id.* at 507. At the time of the creation of this "sample questionnaire," the law regarding English language ability of prospective jurors was that set out above, that an otherwise

11

eligible person would be disqualified if, "[h]e is unable to read, write, speak, and understand the English language." 26 F.R.D. 409, 444 (1960). Accordingly, the "sample questionnaire" asked the following question: "Can you read, write, speak and understand the English language?" *Id.* at Exhibit 1, question 8. This question -- created to capture the English language requirement as it existed in 1960 -- is almost identical to the one currently used by the Southern District on its "Juror Qualification Questionnaire": "Do you read, write, speak and understand the English language?" ER 253 at Question 4. The only difference is the substitution of the word "can" for "do."

Current federal law does not require potential jurors to be able to "read, write . . . and understand the English language," but instead only requires they be able to do so well enough to fill out the "juror qualification form." 28 U.S.C. § 1865(b)(2). By asking, without qualification, whether the potential juror can "read, write . . . and understand the English language," Question 4 sets a higher burden on the prospective juror than the Jury Act permits.

The Government in its pleadings below and the district court in its March 25, 2011, Order both acknowledge that the language in Question 4 of the Southern District's "Juror Qualification Questionnaire" is an incorrect statement of the law as it currently exists. CR 58 & 98; ER 7, 12, 146. The only point of

12

disagreement is whether this legally incorrect language is a technical or substantial violation of the Jury Act. Because it is an error that involves disqualifying potential jurors from service based on an incorrect standard of law and because Hispanic citizens are disproportionately affected by this error, both the fair cross sectional goal and the equal protection guarantee of the Jury Act are sacrificed, making this violation substantial.

a. **The Southern District's jury wheel data from 1999 through 2009 shows that Hispanic citizens are more likely to be removed from consideration for jury service through the qualification process than non-Hispanic citizens.**

The effect of the erroneous language in Question 4 can be seen in the disproportionate decrease in Hispanic citizens from the master to the qualified wheel for every wheel from 1999-2009. ER 8 & 255-66. Compared to non-Hispanic citizens, the drop-off rate for Hispanic citizens through the qualification process is higher every year from 1999 through 2009. The following table shows the rates at which Hispanic citizens are lost through the qualification process compared to non-Hispanic citizens:

**Table 1.**

| Year | Percentage decrease in Hispanic citizens who return "Questionnaires" to those who make it on to "Qualified  Wheel" | Percentage decrease in Non-Hispanic citizens who return "Questionnaires" to those who make it on to "Qualified Wheel" |
|------|---|---|
| 1999 | - 40% | - 37% |
| 2001 | - 50% | - 38% |
| 2003 | - 45% | - 40% |
| 2005 | - 42% | - 36% |
| 2007 | - 45% | - 37% |
| 2009 | - 46% | - 37% |

This data includes only Hispanics already known to be citizens (because registered voter lists are used) and who are likely to possess the minimal English required by the Jury Act (even if naturalized).  Section 1423(a)(1) of Title 8 requires persons seeking to naturalize to demonstrate, "an understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language. . . ."  The only exceptions to this requirement are permitted for persons "over fifty years of age and . . . living in the United States for periods totaling at least twenty years subsequent to a lawful admission or permanent residence, or . . . over fifty-five years of age and . . . living in the United States for periods totaling at least fifteen years subsequent to a lawful admission for permanent residence." 8 U.S.C. § 1423(2)(A) & (B).  Thus, even if one were to assume some Hispanic

14

citizens speak English as a second language, there is no reason to believe they could

not meet the very minimal English proficiency requirements set forth in the Jury Act.

### b. A review of the "Juror Qualification Questionnaires" returned by prospective jurors shows this erroneous language is causing qualified Hispanic citizens to be wrongly excluded from federal jury service.

Even though Hispanics made up only 17.66% of persons returning

"Questionnaires" for the 2009 wheel, 69.7% of the persons answering "no" to

Question 4 -- and being rejected from the qualified wheel -- were Hispanic. The

review of these disqualified respondents' "Questionnaires" revealed:

(1)     a substantial number of prospective jurors who are high
school graduates/GED recipients and who are gainfully
employed are being disqualified because of their "no"
answers to Question 4.  ER 267-352.

These jurors are returning self-completed
"Questionnaires" -- there is no indication that anyone
assisted them in filling out the "Questionnaires" -- so
they necessarily satisfy 28 U.S.C. § 1865(b)(2) in that
they can read, write, and understand English well
enough to fill out the "Questionnaire."

Their education and employment (as teachers, bank
tellers, dental assistants, postal employees, etc.) make it
unlikely that, had they been asked the legally correct
question, they would have been disqualified under
§ 1865(b)(3); and

(2)     prospective jurors' comments accompanying "no"
answers to Question 4 highlight the erroneously

15

heightened English proficiency the clerk's office is requiring. ER 353-460.

A total of 5,625 Hispanic citizens were disqualified, excused, or exempted from jury service in the Southern District for the 2009 jury wheels (12,250 returned their "Questionnaires" but only 6,625 made it onto the qualified wheel). ER 8. Of these 5,625 disqualified, excused, or exempted Hispanic jurors, at least 25.2% -- or 1,420 Hispanic citizens -- were disqualified from jury service *solely because of their answer to the outdated English proficiency question*. CR 98; ER 8. Each of these 1,420 Hispanic citizens filled out the "Questionnaire" on their own, necessarily satisfying 28 U.S.C. § 1865(b)(2) (i.e., they each could "read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form"). CR 58; ER 151. The *only* question is whether they were "unable to speak the English language." 28 U.S.C. § 1865(b)(3).

A review of the "Remarks" section on the "Questionnaires" reveals that the legally incorrect language of Question 4 is not only creating profound confusion among prospective jurors, but is also resulting in the incorrect disqualification of these jurors, thereby closing the courthouse doors to well over a thousand of legally qualified Hispanic citizens and significantly undermining the Jury Act's fair cross sectional and equal protection goals.

16

    **i.**    **The Jury Act requires that jurors not be "unable to speak the English language." Is this the same as requiring a juror speak English "well," "very well," "100%," "fluently" or requiring a juror have "full knowledge of legal terms"?**

Among the 1,420 Hispanic citizens removed from consideration for federal jury service because of their answer to Question 4 are a considerable number of persons who -- based solely on their answers on the "Questionnaires" -- are unlikely to be unqualified for federal jury service, if screened under the correct legal standard. All of these Hispanic citizens have filled out the "Questionnaires" by themselves[8] (thereby necessarily satisfying 28 U.S.C. § 1865(b)(2)) and are "teachers in local public schools,[9] bank tellers,[10] and nurses[11] in hospitals" who, according to the district court, "must be able to read, write, understand, and speak English well if not fluently to perform their jobs." ER 8. The district court deemed their answers to Question 4 "clearly incorrect." ER 8. But, the court went on to speculate that some of these persons must be answering Question 4 dishonestly "in hopes of being disqualified from jury service." ER 8-9.

---

[8] CR 58; ER 151.

[9] ER 269, 271.

[10] ER 273.

[11] ER 267, 353.

17

There is nothing on the "Questionnaire" that indicates to a prospective juror that a "yes" or "no" answer to Question 4 affects eligibility for jury service. ER 253-54. Moreover, these prospective jurors all "declare under penalty of perjury that all answers are true." ER 253 at no. 16. There was absolutely no evidence presented below to support the court's theory that some of the 1,420 Hispanic citizens who answered "no" to Question 4 were intending to violate federal law (28 U.S.C. § 1864(b) makes it a crime to "willfully misrepresent[] a material fact on a juror qualification form for the purpose of avoiding . . . service as a juror"). Instead, there was considerable evidence in the comments left in the "Remarks" section by disqualified Hispanic citizens to show how the outdated wording of Question 4 has created confusion about the level of English proficiency required by law for federal jury service.

Based on the comments in the "Remarks" section of the "Questionnaire," Hispanic citizens are understanding Question 4 to require: "fluen[cy] in legal matters or issues," "full knowledge of legal terms," an understanding of "legal words," and the ability to "speak, write or read the English language 100%." For example, Hispanic citizens disqualified because of "no" answers to Question 4 include:

- a registered nurse with Kaiser Permanente with a "[h]igh school/GED equivalent" education and a "[t]rade/[v]ocational school"

18

education who indicated in the "Remarks" section -- in English -- "I dont feel fluent in legal matters or issues." ER 353-54;[12]

• a woman who works for a Charlotte Russe clothing store and who has a "[h]igh school/GED equivalent" education who wrote in the "Remarks" section -- in English -- "I don't fully understand the english language and don't have the full knowledge of legal terms." ER 355-56;

• a woman who wrote in the "Remarks" section -- in English -- "I cannot read or write English well enough to serve on a jury." ER 357-58;

• a tax preparer with a "[h]igh school/GED equivalent" education wrote in the "Remarks" section -- in English -- "4. I DO NOT SPEAK FLUENT ENGLISH." ER 359-60;

• a checker at Stater Brothers with a "[h]igh school/GED equivalent" education who wrote in the "Remarks" section -- in English -- "Not fluent in English. Read and write some english" ER 361-62;

• a woman who wrote in the "Remarks" section -- in English -- "4. I understand English and I can speak well, but I don't feel sure I can serve as a juror. There are some words difficult for me to read or speak." ER 363-64;

---

[12] These "Remarks" are presented with an attempt to correctly capture capitalization, punctuation, and spelling as expressed by the prospective jurors on the "Questionnaires." All of these "Juror Qualification Questionnaires" (as well as other examples of prospective jurors who should not have been disqualified for lack of English proficiency) are included in the ER 267-460. *This is a representative sample, not the universe of "Questionnaires" that fall into this category*. This sub-group was selected because the combination of filling out the form themselves, with their education, employment, or "Remarks," make it highly unlikely they lack the basic English language ability to qualify for federal jury service under the Jury Act. Of course, federal law requires neither formal education nor employment to qualify for jury service.

19

- a woman with a "[h]igh school/GED equivalent" education who wrote in the "Remarks" section -- in English -- "4.) Do not speak, write english 100%." ER 365-66;

- a woman employed in "architecture/construction" an "[a]bove high school" education wrote in the "Remarks" section -- in English -- "I DON'T SPEAK ENGLISH 100%." ER;

- a woman with a "[h]igh school/GED equivalent" education wrote in the "Remarks" section -- in English -- "#14 Sorry but I don't write, speak and understand 100% English.  Thank you. [signature]" ER 370-71;

- a woman employed as a Quality Assurance Tech in a bakery wrote in the "Remarks" section -- in English -- "I do not speak, write or read the English language 100%.  My first language is Spanish." ER 371-72;

- a cashier at Walmart with a "[h]igh school/GED equivalent" education  wrote in the "Remarks" section -- in English -- "I'm not a fluent in English."  ER 373-74;

- a woman who wrote in the "Remarks" section -- in English -- "Question 7 I don't know what to answer.  Question 14 I don't know how to speak, write and read 100% English.  I don't understand legal words." ER 375-76;

- a cashier with an "[a]bove high school" education wrote in the "Remarks" section -- in English -- "4) I do speak, write and understand common and everyday phrases, but I am afraid not understanding legal terms in a court.  I am a first and fully Spanish speaker. . . ." ER 377-78;

- a woman with a "[h]igh school/GED equivalent" education wrote in the "Remarks" section -- in English -- "I was born in El Salvador and did not move to the USA until I was over 40 years old.  I speak english, however, I do not read or write very well and have a difficult time comprending written english" ER 379-80;

20

• a man wrote in the "Remarks" section -- in English -- "I do not write english well" ER 381-82;

• a cashier at the Marine Corps Community Services Miramar Exchange with a "[h]igh school/GED equivalent" education wrote in the "Remarks" section -- in English -- "#4 - I Don't write, read and speak English very well." ER 383-84.

The "Remarks" left by some of these prospective jurors indicate concern that they do not have fluency in English, but federal law does not require fluency in English to serve as a juror. Instead, 28 U.S.C. § 1865(b)(3) only requires prospective jurors not be "unable to speak the English language." Additionally, they express concern that they do not know how to read or write English "100%" or do not know "legal words," "legal terms," or "legal matters or issues." But again, federal law only requires a juror be able to read, write, and understand the English language well enough to fill out the "Juror Qualification Questionnaire." 28 U.S.C. § 1865(b)(2). There are a number of other Hispanic citizens whose education, employment in the community, and "Remarks" raise serious doubts about their inability to qualify for federal jury service if they had been evaluated under the correct English proficiency standard. ER 267-460. If the clerk's office were using the correct legal standard, it is unlikely that any of these Hispanic citizens would have been disqualified from federal jury service.

21

### c. Is the questionable disqualification of 1,420 Hispanic citizens from jury service based on an incorrect legal standard a substantial violation of the Jury Act?

The Jury Act only provides remedies for violations that are substantial. 28 U.S.C. § 1867(d). This Court has determined that violations are technical when "they do not frustrate the Act's goals of obtaining jury lists that are a cross-section of the community, allocating jury duty fairly among the citizenry, and determining disqualifications, excuses, exemptions and exclusions on the basis of objective criteria only." *Erickson*, 75 F.3d at 477 (citations omitted).

In *United States v. Nelson*, this Court found a technical violation when a juror -- who was on the qualified wheel -- showed up for jury service on a day when he had not actually been called to serve. 718 F.2d 315 (9th Cir. 1983). This one juror's "mistake" was found not to frustrate the Jury Act's goals. *See id.* at 318-19.

Then, in *Erickson*, this Court again found no substantial violation of the Jury Act, where a district court judge called additional venirepersons in the middle of voir dire (because the existing pool was dwindling and the court was concerned they might run out of jurors), but instructed the clerk to only call venirepersons who resided within 25 miles of the courthouse. The judge feared expanding beyond the 25-mile range would delay the trial by at least a day. *See Erickson*, 75 F.3d at 476. The appellant complained that this 25-mile limit excluded four Indian reservations but

22

presented absolutely no evidence that the venirepersons found within the 25-mile radius was unrepresentative of the greater community in any way. *See id.* at 477.

In *United States v. Santos*, the appellant complained that the clerk's failure to follow up on why 38 potential jurors failed to return their "Questionnaires" constituted a violation of the Jury Act. 588 F.2d 1300 (9th Cir. 1979). But this Court pointed out that 28 U.S.C. § 1864(a) allows -- but does not require -- the clerk to summon persons to appear for the purpose of filling out a "Questionnaire" when they have failed to return the "Questionnaire." *See id.* at 1303. Thus, none of these cases presented a *systemic* deficiency in the selection process.

In the Southern District, 69.7% of all persons who answered "no" to Question 4 are Hispanic citizens. One-quarter (25.2%) of Hispanic citizens who were disqualified from federal jury service were disqualified *solely because of their answer to the outdated Question 4*. Over the last decade, a greater percentage of Hispanic citizens has been lost through the qualification process than non-Hispanic citizens for each of the six master wheels. Both the goals of "obtaining jury lists that are a cross section of the community" and that of "allocating jury duty fairly among the citizenry" are eviscerated by the Southern District's screening of jurors with the English language proficiency requirement as it existed in 1948 and not as it exists today. This isn't a situation where one qualified juror showed up for service on the wrong day, as in

*Nelson*.  It isn't a situation where the clerk's office failed to do something that is unquestionably discretionary under the Jury Act, as in *Santos*.

Here, thousands of Hispanic citizens were evaluated for English proficiency under the incorrect legal standard, at least 1,420 were never placed in the qualified wheel solely because of their answers to the incorrect Question 4 and were never evaluated by the district court as to whether they possessed the minimal English proficiency actually required by law.  Instead, these prospective jurors read the outdated language, informed the clerk's office they weren't "fluent" in English, couldn't read or write "100%", that they didn't know "legal matters or issues," "legal terms," or "legal words," and the clerk's office decided to close the courthouse doors to them.[13]  This systematic exclusion of Hispanic citizens from jury service in the Southern District is a substantial violation of the Jury Act.

---

[13]  The Southern District's " Local Civ. R. 83.10(c)(5) "authorizes the clerk of the court, under supervision of the court, to determine whether persons are qualified, unqualified, exempt, or excused from jury service."

**II.     The Southern District of California Is Failing to Properly Supervise the Clerk's Office in the Administration of the Jury Qualification Process and Hispanic Citizens Who Answer "Yes" to Question 4 Are Also Being Improperly Disqualified from Jury Service If They Express Any Hesitation about Their English Language *Fluency*.**

Not only are Hispanic citizens who answer "no" to Question 4 being disqualified from jury service in the Southern District, but those answering "yes" to Question 4 are being disqualified as well.  This group of disqualified jurors raises serious questions about the district court's supervision of the juror qualification process.  The Jury Act allows the district court to delegate the qualification process to the clerk's office, but the process must always remain "under [the] supervision of the court."  28 U.S.C. § 1865(a).  Through the Local Rules, the Southern District has delegated this process to the "clerk of court" but instructs that any "[q]uestionable . . . status determinations shall be directed to the court."  Local Civ. R. 83.10(c)(5).  A number of disqualifications of Hispanic jurors who answer "yes" to Question 4, strongly suggest a lack of court supervision in violation of 28 U.S.C. § 1865(a) and Local Civ. R. 83.10(c)(5).

Take, for example, the disqualification of a Hispanic "dental assistant" at Centinela State Prison.  She has both a "[h]igh school/GED equivalent" and a "[t]rade/[v]ocational school" education.  She answered "yes" to Question 4, yet she is disqualified from jury service.  There are absolutely no bases for disqualification

on her "Questionnaire." There is, however, a note in the "Remarks" section. In the "Remarks" section, she wrote: "I speak english but not very good." ER 461-62. If the district court were properly supervising the juror qualification process, this juror would not have been disqualified. Her education, employment, answer to Question 4, and remark on the back of the "Questionnaire" indicate she fully satisfies both 28 U.S.C. § 1865(b)(2)-(3). The disqualification of this juror strongly suggests that the jury clerks determining juror qualification in the Southern District are not aware of the law and are not being properly supervised by the district court. Sadly, this prospective juror is not the only person erroneously excluded.

Another Hispanic citizen marked both "yes" and "no" to Question 4, highlighting the problems with the use of this compound question (i.e., "Do you read, write, speak and understand the English language?"). This woman works as a merchandising assistant manager and has an "[a]bove high school" education. She indicated in the "Remarks" section (with perfect syntax and punctuation), "I read, write and speak English, however, I'm not sure if my English would be enough to serve as a juror. I understand it but I'm not sure if they use a high level vocabulary when serving as a juror. Other than that no other issues." ER 463-64. This woman was also disqualified from jury service. There are absolutely no bases for disqualification on her "Questionnaire." If this "Questionnaire" had been reviewed

26

by the district court or a jury clerk who had been properly instructed in the law and supervised in the qualification process, this prospective juror would not have been erroneously disqualified.

The more disqualified jurors' "Questionnaires" that are reviewed, the more erroneous disqualifications that one finds. Examples of yet more Hispanic-Americans who answered "yes" to Question 4, who indicated no bases for disqualification, and who are then disqualified from jury service include:

- a woman with an "[a]bove high school" education who works as a dental hygienist and who wrote in the "Remarks" section: "Portugese is my primary language. I believe I do not know enough legal terms to be a fair juror." ER 465-66;

- a woman with a "[h]igh school/GED equivalent" education and employment with Accent Care who wrote in the "Remarks" section: "Not fluent in English" ER 467-68;

- a woman with a "[h]igh school/GED equivalent" education and who is employed as a child care provider who wrote: "80%" above Question 4 but also answered Question 4 "yes" ER 469-70;

- a man with a "[h]igh school/GED equivalent" education who works for General Dynamics NASSCO who marked "no" to Question 4, then crossed it out and marked "yes" ER 471-72;

- a man with a "[h]igh school/GED equivalent" education and an "[a]bove high school" education who is employed with "Naval Industrial Systems Support" who wrote in the "Remarks" section: "4.- Not write, 75% understand" ER 473-74;

27

- a man who works at La Costa Resort in Carlsbad and who wrote in the "Remarks" section: "I do not speak English very well and I don't read and write very well." ER 475-76;

- a man who is employed as a truck driver and who wrote in the "Remarks" section: "I'm NOT fluent In English" ER 477-78

- a man with a "[h]igh school/GED equivalent" education who works as a sub-supervisor at Work Training Center, Inc. and who wrote in the "Remarks" section: "I speak Little English, Understand, Read & Writte." ER 479-80;

- a man with a "[h]igh school/GED equivalent" education and employed with the Family Health Center of San Diego who wrote in the "Remarks" section: "I am able to speak, write & understand English but not very fluently, to help determine if someone is guilty or inocent. One day I would be proud to serve on a jury as a new U.S. Citizen. I'm still studying English and look forward to serving in the future. [signature]" ER 481-82;

- a woman who works at Chico's (a women's clothing store) and who has a "[h]igh school/GED equivalent" education wrote in the "Remarks" section: "I DO NOT HAVE SUFICIENT KNOWLEDGE OF ENGLISH TO UNDERSTAND MANY WORDS MEANING AND LESS OF LEGAL THINGS. I HAVE SAID THIS IN ALL PREVIOUS JURY DUTY REQUESTS." ER 483-84.

All of the Hispanic citizens listed above were legally qualified for jury service. They each correctly completed their "Questionnaire" with no assistance, satisfying 28 U.S.C. § 1865(b)(2). They all answered "yes" to Question 4. None were "unable to speak the English language" per 28 U.S.C. § 1865(b)(3). If the district court were supervising the qualification of these jurors as required, the standard for English

28

proficiency would have been the legal standard set out in the Jury Act -- not 100% competency, "fluency," or understanding of "legal terms." None of these Americans should have been excluded from jury service, because English is not their first language or because they do not understand "legal terms."

Mr. Hernandez-Estrada argued below that the jury clerks and jury administrator were not being properly supervised as required by both the Jury Act and the local rules and that these erroneous disqualifications show the damage done by the court's failure to supervise. CR 41; ER 216-18. The Government presented evidence supporting this argument in the form of a statement by the jury administrator that her jury clerks independently make the qualification determinations and that any "ambiguous questionnaires" go to the jury administrator -- no mention is made of the court -- for review. CR 84; ER 113. In fact, in its written order, the district court indicated that in the situations described above: "the jury clerk should not disqualify the individual on the basis of English language proficiency, but, rather, should allow the court to make the determination." ER 19. This is because the district court below "agree[d]" that all of the disqualified Hispanic citizens described above should have had their qualification status determined by the district court -- not the jury clerks or jury administrator. ER 12-13. The district court also instructed that the "jury clerk

should not make qualification determinations based on potential jurors' concerns regarding their understanding of legal terms or general level of fluency." ER 13.

The district court failed to find a substantial violation, because it found that the jury clerks were disqualifying all (not just some) of the prospective jurors who made "Remarks" about language and because the number of persons who answered "yes" but were improperly disqualified "appear[ed] to be quite small." ER 13. But all of these prospective jurors are members of a distinct, cognizable class. They are *in addition to* the 1,420 other Hispanic citizens who were disqualified from jury service based on a legally incorrect English proficiency standard, resulting in a number of affected Hispanic citizens that is anything but "small." The failure to supervise the qualification process and these erroneous disqualifications of Hispanic citizens constitute additional, substantial violations of the Jury Act.

### III. The Failure to Return "Questionnaires" to Jurors Who Omit Required Information on Race/Ethnicity Violates 28 U.S.C. § 1864(a) and Renders It Impossible to Achieve an Accurate View of the Racial and Ethnic Composition of the Master and Qualified Wheels.

When Congress first passed the Jury Act in 1968, potential jurors were not required to state their racial or ethnic backgrounds. S. Rep. No. 92-1144, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3402. U.S. Representatives Robert McClory and Charles E. Wiggins had both urged Congress to require prospective jurors to provide

30

this information. H.R. Rep. No. 90-1076, at 16-17 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1808-09. They posed the following question:

> When a litigant claims that discrimination has been practiced, what is his remedy? Unless the discriminators openly admit their wrong, the litigant must compare the characteristics of the jury pool with the characteristics of the community. . . .

> At this critical stage when the challenger needs proof of just who is in the jury pool, this legislation refuses to insure its availability. . . .

> Thus the challenger may be denied the very information he needs to make the bill work. If a significant number of people fail to supply the necessary data in completing the juror qualification form so that the character of the jury pool cannot be gleaned from the forms, the challenger will then be compelled to undertake his own survey. We fear that the burden of that task will retard the enforcement of this legislation.

*Id.*

Although the Jury Act now requires the reporting and collecting of this data to monitor representativeness, the Southern District clerk's office fails to collect the information as required by law, when it's omitted from a returned "Questionnaire." The failure of the clerk's office to collect this required data has resulted in Mr. Hernandez-Estrada being "denied the very information he needs to make" the Jury Act work.

31

**a. The Jury Act was amended in 1972 to require potential jurors to provide race/ethnicity information so that reliable information to reveal and remedy discrimination would be available.**

Congress eventually embraced Reps. McClory and Wiggins' perspective. In 1972, Congress amended the Jury Act to require that potential jurors provide data about their race/ethnicity. 28 U.S.C. § 1869(h); S. Rep. No. 92-1144, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3402. This change was based on courts' experience that as many as 30% of prospective jurors failed to state their race/ethnicity after original implementation of the Jury Act. S. Rep. No. 92-1144, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3402 ("Although this information is requested, studies show that it is omitted by up to 30 percent of the respondents. The result is that there is little reliable information that can be used to determine if discrimination exists."). With the widespread failure of prospective jurors to provide this data, Congress found that, "[o]ne cannot accurately determine whether litigants in the Federal courts are having their matters considered by jurors who represent 'a fair cross section of the community' as required by the Jury Selection Act." *Id.* at 2. Congress also found that without that data, it would be "impossible effectively to monitor and enforce nondiscrimination in the selection of Federal jurors." *Id.* at 2.

Thus, 28 U.S.C. § 1869(h) states that the juror qualification form "shall elicit the . . . race" of the potential juror. To ensure that such information is eventually received even if not originally provided, 28 U.S.C. § 1864(a) states that, "*[i]n any case in which it appears that there is an omission*, ambiguity, or error in a form, the clerk or jury commission *shall return the form* with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk or jury commission within ten days." *Id.* (emphasis added). But the clerk's office is *never* returning these "Questionnaires" and the true demographics of the Southern District's jury pools remain unknown.

**b. Even though the Jury Act requires that "Questionnaires" be returned where "there is an omission . . . in a form," the clerk's office fails to return those forms missing information on race/ethnicity, so no reliable information is maintained to monitor and enforce non-discrimination.**

In the Southern District, the jury clerks never returns those "Questionnaires" lacking information on race/ethnicity, despite the language of 28 U.S.C. § 1864(a) directing otherwise. ER 540-41. The direct result of this failure is that it is "impossible effectively to monitor and enforce nondiscrimination in the selection of Federal jurors" in the Southern District. *See* S. Rep. No. 92-1144, at 2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3402, 3403. The following chart shows the rate at

33

which prospective jurors returning the "Questionnaire" fail to answer the questions on race and ethnicity:

**Table 2.**

| Year | Rate of Non-Response to Race Question | Rate of Non-Response to Ethnicity Question[14] |
|------|---------------------------------------|-------------------------------------------------|
| 1999 | 9.39 % | 27.82 % |
| 2001 | 12.72 % | 60.76 % |
| 2003 | 20.49 % | 37.45 % |
| 2005 | 19.14 % | 38.27 % |
| 2007 | 20.82 % | 38.51 % |
| 2009 | 18.17 % | 35.85 % |

*See Report on Operation of the Jury Selection Plan, Southern District of California from 1999 to 2009*; ER 255-66.

While responses to the "race/ethnicity" questions are *required* by 28 U.S.C. § 1869(h), this is not indicated next to this question on the Southern

---

[14] The response rate to this question might be enhanced by placing the ethnicity question *before* the question on race. The U.S. Census, for example, has had success with this change. Arthur R. Cresce, Audrey Dianne Schmidley, and Roberto R. Ramirez, *Identification of Hispanic Ethnicity in Census 2000: Analysis of Data Quality for the Question on Hispanic Origin,* at 8-9 (U.S. Census Bureau, Population Division Working Paper No. 75) ("Sequencing of the Hispanic question before the race question may have finally resolved the problem of how to improve the response level of the Hispanic question without the use of a field content-edit followup.") (citation omitted).

34

District's "Questionnaire." The prospective juror must look on the back of the "Questionnaire" and locate the "notes" section to find the following:

> Question 10 - RACE/ETHNICITY. Federal law requires you as a prospective juror to indicate your race. This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service. By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur. In this way, the federal court can fulfill the policy of the United States, which is to provide jurors who are randomly selected from a fair cross section of the community.

In order to increase the response rate to this question, it would have made much more sense -- and have been much less confusing -- to have the directions to Question 10 actually next to Question 10. *See* ER 253-54.

The rate of non-response to the ethnicity question in the Southern District is substantially worse for every wheel since 2001 than the 30% the district courts were seeing between 1968 and 1972 that motivated the change in the law. From 2001 and 2009, between a third (35.85%) to almost two-thirds (60.76%) of prospective jurors returning their "Questionnaires" failed to indicate their ethnicity. Despite the plain language of 28 U.S.C. § 1864(a), none of these "Questionnaires" were returned because of these omissions and Mr. Hernandez-Estrada had "little reliable information [available] to determine if discrimination exists." S. Rep. No. 92-1144, at 1(1972), *reprinted in* 1972 U.S.C.C.A.N. 3402 .

35

    **c. Despite the plain language of the Jury Act, the district court erroneously abdicated its judicial function to the Administrative Office of the U.S. Court's interpretation of the Jury Act in determining there was no need to return "Questionnaires" omitting information despite Congress's unequivocal intent.**

In evaluating whether the Southern District's failure to return these "Questionnaires" omitting race/ethnicity was a substantial or technical violation of the Jury Act, the district court decided to defer to what it found to be a "reasonable" interpretation of the statute by the Administrative Office of the U.S. Courts (hereinafter "A.O."). ER 15. The district court decided that the statute could not mean what it said. While 28 U.S.C. § 1864(a) says, "[i]n any case in which it appears that there is an omission . . . in a form, the clerk or jury commission shall return the form," the district court decided that Congress instead really meant to insert the word "significant" before "omission." ER 14. Thus, the district court decided it needed to determine if the "omission" was "significant" enough to result in the "Questionnaire" being returned before determining whether this was a substantial violation of the Jury Act. This was error.

First, the A.O.'s analysis relied on by the district court ignores the express language of 28 U.S.C. § 1864(a). According to the A.O., district courts do not need to return "Questionnaires" omitting information, because district courts have "no

36

mandatory obligation to police the unreturned form per se." ER 14. The problem with this reasoning is that the statute expressly uses the word "may" in describing the how the district courts deal with "Questionnaires" that are not returned contrasted with Congress's use of the word "shall" in describing "Questionnaires" which *must be returned* when they have "omission[s]". Congress chose to treat unreturned "Questionnaires" differently from "Questionnaires" with "omissions."

Second, the language of the statute is unambiguous and the intent of Congress is clear. If a returned "Questionnaire" has omitted information, it "shall" be returned. 28 U.S.C. § 1864(a). There is no need for the district court to "defer[]" to the A.O.'s "reasonable" interpretation. In its earlier order in the *Garcia-Arellano* case, the district court found the A.O.'s interpretation was "entitled to deference akin to *Chevron* deference."[15] ER 31. But, at the motions hearing below, Mr. Hernandez-Estrada argued that *Chevron* deference was not appropriate in this situation where Congress had unambiguously expressed its intent. ER 69-70. *See Garcia v. Holder*, 659 F.3d 1261, 1266 (9th Cir. 2011) ("Where the statute is unambiguous and congressional intent is clear both the court and the agency must give effect to the unambiguously expressed intent of Congress.") (internal quotation marks and citation

---

[15] *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

37

omitted). In the written order in this case, the court removed its reference to "*Chevron* deference" but still "defer[red]" to the A.O.'s "reasonable" interpretation. ER 15. But, because the language of 28 U.S.C. § 1864(a) is "unambiguous and congressional intent is clear" the district court erred in not giving "effect to the unambiguously expressed intent of Congress." This violation of the Jury Act is substantial because of the detrimental effect it had on Mr. Hernandez-Estrada's ability to present evidence in support of his underrepresentation claims described below.

### d. The failure to return "Questionnaires" omitting race/ethnicity information had real, detrimental effects on Mr. Hernandez-Estrada's ability to present the district court -- and this Court -- with accurate data to evaluate his statutory and constitutional claims.

The Government has never disputed that the voter registration lists -- the sole source from which potential jurors in the Southern District are identified -- underrepresent Hispanic and African-American citizens and overrepresent non-Hispanic white citizens. The Government also has never disputed that Hispanic citizens are disproportionately disqualified through the Southern District's juror qualification process compared to non-Hispanic citizens. Nevertheless, through some miracle of statistics never explained, the Government posited -- and the district court found -- that Hispanic citizens are actually overrepresented on Southern District jury pools.

38

The failure of the Southern District to accurately gather the race/ethnicity data required by 28 U.S.C. § 1864(a) resulted in the Government and the district court engaging in creative -- though unsound -- math. The Government and district court relied on dicta in *United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005), as support for their unsound calculations. In *Rodriguez-Lara*, a *pro se* defendant attempted to challenge the jury selection procedures used in the Fresno Division of the Eastern District of California. He requested the appointment of an expert to assist him in his challenge. That request was denied by the district court. On appeal, the panel attempted to discern whether the *pro se* defendant had made a prima facie showing of a Sixth Amendment violation based on the data presented below. *See id.* at 941-45. In examining the available data, the panel noted that 24% of the qualified jury wheel in that district failed to indicate its ethnicity. *See id.* at 944 n.11. In an attempt to use the data provided to the court below to evaluate the claim, the panel decided to just ignore the missing data and recalculate the ethnicity of the qualified wheel as if none of the non-responding jurors were in the qualified wheel. *Id.* Based on this recalculation, the panel found that Rodriguez-Lara had made a prima facie case of a Sixth Amendment violation on some prongs, but ultimately found his prima facie showing was incomplete and that the district court had abused its discretion in failing

39

to appoint an expert to assist the defendant in attempting to make the necessary showing. *See id.* at 947.

Following the lead of footnote 11 from *Rodriguez-Lara*, the district court here also decided to just ignore those prospective jurors who failed to provide race/ethnicity information. ER 4-5. By doing this, the district court then concluded that Hispanic citizens are actually over-represented on Southern District jury wheels. ER 5. Neither the court nor the Government could explain, however, how source lists which undisputably underrepresent Hispanic citizens could be filtered through a juror qualification process that wheel-after-wheel excludes Hispanic citizens at a greater rate than non-Hispanic citizens, and end up with a qualified jury wheel that overrepresents Hispanic citizens compared to their representation in the community.

Mr. Hernandez-Estrada presented the court below with evidence explaining why just ignoring the non-respondents to the ethnicity question in this case would not yield an accurate picture of the ethnic makeup of the master or qualified wheels in the Southern District. As defense experts Professors Abramson and Rose explained, the response rate for the ethnicity question is too low to be able to reliably extrapolate from the known data to the unknown. ER 494, 501-02. In order for the data to be reliably representative of the whole, a response rate between 75-89% is needed. ER 502. The response rate in *Rodriguez-Lara* was 76% -- at the low end, but still

40

within that range. *Rodriguez-Lara*, 421 F.3d at 944 n.11. In the Southern District, the response rate to the ethnicity question was 64.16% in 2009, 61.49% in 2007, 61.73% in 2005, 62.54% in 2003, 39.24% in 2001, and 72.17% in 1999. ER 255-66. It is impossible, based on those consistently low rates of response, to extrapolate reliably from the known respondents to the demographics of the whole group. Neither the Government nor the district court even attempted to explain how the data collected with such a low response rate could be reliably extrapolated to find the true demographics of the whole group.

The fact that the district court and the Government are even engaging in these creative calculations shows the detrimental effect of the jury clerks' failure to return "Questionnaires" as required by 28 U.S.C. § 1864(a). The district court is in the unique position of being able to gather and monitor the demographic composition of the jury wheels. Congress, through the Jury Act, has provided the district court the tools to collect the data, when it is omitted. But the clerk's office has refused to return the "Questionnaires" to collect the required data. Mr. Hernandez-Estrada is therefore unable to provide accurate data of who is in the jury pool and is also unable to refute with accurate data the faulty calculations by the district court. "At this critical stage when [Mr. Hernandez-Estrada] need[ed] proof of just who [was] in the jury pool," he was "denied the very information he need[ed] to make the bill work." *See*

41

H.R. Rep. No. 90-1076, at 16 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1809. Failure to collect omitted data as required by 28 U.S.C. § 1864(a) was another substantial violation of the Jury Act that detrimentally affected Mr. Hernandez-Estrada's ability to present evidence supporting his claim to the district court, to this Court, and made it impossible to monitor compliance with the fair cross section and equal protection aims of the Jury Act (28 U.S.C. §§ 1861 & 1862) and the Fifth and Sixth Amendments as discussed in Section V(d) below.

**IV.**  **The Southern District's Repeated Failure to Monitor Jury Representativeness Unless Prompted to by Pending Litigation Is Contrary to the Explicit Instructions of the Administrative Office of the U.S. Courts, the Judicial Conference of the United States, 28 U.S.C. § 1863(a), and the Very Spirit of the Jury Act Aimed at Ending Discrimination in Federal Jury Service.**

According to the Jury Act, the Southern District is required to "submit a report on the jury selection process within its jurisdiction to the Administrative Office of the United States Courts in such form and at such times as the Judicial Conference of the United States may specify."  28 U.S.C. § 1863(a).  The Form AO-12: "Report on Operation of the Jury Selection Plan" is the "report" created by the A.O. for the district courts to monitor their success in complying with the Jury Act.  ER 577-78. In 1982, the Judicial Conference of the United States modified the reporting requirements of § 1863(a) such that district courts are no longer required to submit the

42

AO-12's to the A.O., but "[the AO-12's are] required to be prepared for retention by the court as one of the jury wheel records." Form AO-12: JURY REPRESENTATIVENESS STATISTICS, Data Collection Instructions, General (hereinafter "AO-12 Instructions"); ER 577-78. This change was motivated by the Judicial Conference's finding that "the responsibility for complying with the requirements of the Jury Act remains with the district court [not the A.O.] and that the judicial councils of the circuits should exercise oversight responsibility." *Report of the Proceedings of the Judicial Conference of the United States*, at 114 ( S e p t e m b e r 2 2 - 2 3 , 1 9 8 2 ) , *a v a i l a b l e a t* http://www.uscourts.gov/FederalCourts/JudicialConference/Proceedings/Proceedings.aspx?doc=/uscourts/FederalCourts/judconf/proceedings/1982-09.pdf (last visited January 17, 2012).

According to the instructions provided by the A.O., the AO-12 form "is required to be completed upon . . . [t]he periodic refilling of the master wheel. . . ." AO-12 Instructions, General; ER 577. In the Southern District, it appears that from 1999 and continuing through 2007 AO-12's were completed only in response to litigation not -- as intended -- to measure the district court's success in achieving the aims of the Jury Act.

**a. The timing of the 1999, 2001, and 2003 AO-12's strongly suggests they were filled out only in response to litigation in the *United States v. Martinez-Orosco* case, and not upon the refilling of the master wheel as required.**

The A.O. requires the Southern District to complete an AO-12 form upon the refilling of the master wheel. AO-12 Instructions; ER 577. The information collected on the AO-12 allows the district court to "determin[e] whether [its] jury wheels comply with the randomness and nondiscrimination provisions of the Jury Selection and Service Act, and [for the purpose of] comparing statistical samplings of jury wheels against general population data." AO-12 Instructions, General; ER 577.

In January 2004, Raimundo Marinez-Orosco filed a Sixth Amendment challenge to the grand jury that indicted him. *Motion to . . . (3) Order Inspection of Jury Questionnaires and Jury Wheel Re: Motion to Dismiss Indictment Due to Grand Jury's Failure to Represent a Fair Cross-Section of the Community, United States v. Martinez-Orosco*, No. 03cr2601-JAH (S.D. Cal. January 23, 2004). As a result, the Honorable John A. Houston issued an order in February 2004 granting in part an opportunity to inspect juror questionnaires and the jury wheel. On the heels of this motion and order came a flurry of AO-12's. The AO-12 for the 1999 wheel was completed on April 2, 2004; the AO-12 for 2001 was completed in March 2004; and the AO-12 for 2003 was completed on September 28, 2004. ER 261-66. Given the requirements set forth by the A.O. and Judicial Conference, the timing of these

44

AO-12's is striking. Since the master wheel is refilled every two years, Local Civil Rule 83.10(d)(6), and the AO-12 is required to be completed upon the "refilling of the master wheel," the AO-12's should be completed every two years also, so that the Southern District can continually monitor compliance with "the randomness and nondiscrimination provisions of the Jury Selection and Service Act." AO-12 Instructions, General; ER 577. Completing three AO-12's in one year, and only in an obvious response to pending litigation, is contrary to that purpose.

### b. The 2005 and 2007 AO-12's were also not completed upon the refilling of the master wheel, again suggesting that they were filled out in response to litigation in the *United States v. Garcia-Arellano* case.

In November 2008, Jose Garcia-Arellano challenged the jury selection procedures in the Southern District and requested AO-12's dating back one decade. *Motion to Dismiss, United States v. Garcia-Arellano*, No. 08cr2876-BTM (S.D. Cal. November 7, 2008). Exactly one week later, the clerk's office completed two additional AO-12's: for the 2005 and 2007 wheels. Again, because the wheels are refilled once every two years, and the A.O. and Judicial Conference "require[]" the completion of the AO-12's upon the "refilling of the master wheel," multiple AO-12's should not be filled out in one year.

45

The collection and retention of jury representativeness data is critical to the monitoring and self-evaluation that district courts are supposed to undertake as part of the Jury Act. If the Southern District repeatedly fails to conduct this self-evaluation unless and until prompted by litigation, it is not complying with the direction of the A.O. and the Judicial Conference and is in substantial violation of 28 U.S.C. § 1863(a). More importantly, without the biennial creation of AO-12's, the district court has no way of knowing if it is actually netting a fair cross section of the community. This information is essential to public confidence in the fairness of Southern District indictments and trials. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) ("Community participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system.").

### c. The 2009 AO-12 seems to have been issued as a knee-jerk response to the district court's order in the *Garcia-Arellano* case.

The district court issued its written order in *Garcia-Arellano* denying that defendant's challenge to the jury selection procedures on June 9, 2009. ER 20-38. That written order (recommending a "Reexamination of [the Southern District's] Jury Selection Plan") was "courtesy copied" by the district court to the chief judge and the jury judge of the Southern District as well as to the clerk of the court. ER 34-38. Just

46

six days later, the clerk's office produced the AO-12 for the 2009 wheel. ER 579-80.

Unfortunately, this was about a month premature based on the directions given by the

A.O.; the sampling is supposed to occur "at least 90 days" after the date on which the

initial mailing of qualification forms is completed, presumably to give prospective

jurors time to return their "Questionnaires" and to have the sample be most

representative of the demographics of the master and qualified wheels. AO-12

Instructions, Part II; ER 577. Because this sampling was done prematurely, the

district court in this case ordered the production of another AO-12 for the 2009 wheel.

CR 32. Both AO-12's for the 2009 wheel, that done prematurely and that completed

upon the district court's order, are included in the Excerpts of Record. ER 255-

56 & 579-80.

> **d.** **The failure to fill out the AO-12's unless and until prompted to by pending litigation highlights the fact that no one in the Southern District is evaluating if the master and qualified wheels are fair cross sections of the community until it's far too late to do anything about the persistent underrepresentation.**

If the AO-12's had been filled out and examined by the "jury judge" upon the

"refiling of the master wheel" as required, the unrepresentativeness of the wheels and

the failure to follow the Jury Act would have been caught. For example, if the 1999

wheel AO-12 was filled out in August 1999 (as it should have been) instead of almost

five years later in April 2004, the "jury judge" would have seen that *according to the*

47

*Southern District's own calculations* there was nearly a 9-point underrepresentation of Hispanic citizens on the available and qualified wheels and a 2.02% to 2.49% underrepresentation of African-Americans on those wheels as well. The "jury judge" may then have been motivated to seek out the earlier AO-12's to see if this underrepresentation was a continuing pattern, if it was getting worse or better over time, or if it was an anomaly.

At the very least, the "jury judge" could have later compared the 1999 wheel to the 2001 wheel (whose AO-12 should have been completed in November 2002 but was not filled out until two and a half years after that in March 2004) and s/he would have seen that the underrepresentation of Hispanic citizens on the 2001 wheel (again by the clerk's office's own calculations) had jumped to 9.43% on the available wheel and 11.94% on the qualified wheel. The judge would have also seen that the underrepresentation of African-Americans continued on both wheels into 2001. The persistence of the underrepresentation of these minority groups could have led the "jury judge" to question the effectiveness of the Southern District's Jury Selection Plan. The "jury judge" could have then sought out the AO-12's upon the refilling of each master wheel and seen that, in fact, the Southern District was falling short of its "fair cross section" requirements with the filling of each and every master wheel. Perhaps the "jury judge" would have sought out solutions to this problem, solutions

48

suggested back in May 2004 by the Ninth Circuit Jury Trial Improvement Committee and adopted by the Judicial Council of the Ninth Circuit. *See* Ninth Circuit Jury Trial Improvement Committee, *First Report on Goals and Recommendations* at 3-5 (May 2004) (hereinafter "Ninth Circuit Report"); ER 581-95.

Additionally, if these forms were produced and reviewed on a biennial basis as required, the "jury judge" would have also seen that the Southern District was failing to monitor the number of "Jury Qualification Questionnaires" "[r]eturned undeliverable by P.O." from 1999 through 2007. ER 257-64. This is significant, because a large number of undeliverable questionnaires can indicate a problem with the source list (e.g., the addresses are ineffectively capturing the mobility of the population in the Southern District, and the district court should start filtering its addresses through the National Change of Address System, as recommended by the Ninth Circuit Jury Trial Improvement Committee and adopted by the Judicial Council of the Ninth Circuit in 2004). *See* Ninth Circuit Report at 4-5 (May 2004); ER 588-89. The failure to monitor if there are any trends in those "Questionnaires" "[r]eturned undeliverable by P.O." (e.g., they disproportionately are returned from zip codes with high concentrations of minority populations) preclude the district court from discerning if its source list is insufficient to capture a "fair cross section" of the community.

The "jury judge," if s/he had been evaluating the AO-12's, could have also seen the large number of non-responses to the "race/ethnicity" questions and directed the clerk's office to return those questionnaires, as required by 28 U.S.C. § 1864(a). Or s/he could have encouraged the district court to adopt procedures allowing prospective jurors to submit their "Questionnaires" online, as is done in at least nineteen federal district courts, including the Central and Eastern Districts of California. The online qualification program requires the prospective juror to answer the race/ethnicity question to complete his questionnaire.

Lastly, the most disconcerting aspect of the failure to produce the AO-12's as required is that they were apparently not missed. The fact that they were not generated as required upon the refilling of the master wheel, but only in response to litigation, suggests that no one in the Southern District is looking at these forms. No one is evaluating the representativeness of the wheels. No one is monitoring if the Southern District's Jury Selection Plan is meeting its goal of providing "all litigants in this court . . . the right to grand and petit jurors selected at random from a fair cross section of the community" or its goal of providing "all qualified citizens resident within the District, . . . the opportunity to be considered for service on grand and petit juries." Local Civil Rule 83.10(b).

It's ultimately the responsibility of the district court to ensure that the jury selection procedures are implemented as laid out in the Southern District's jury plan, in compliance with the Jury Act and the Constitution, and the requirements set forth by the A.O., and Judicial Conference of the United States. H.R. Rep. No. 90-1076, at 8 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1799 ("responsibility for supervision and control lies with the chief judge of the district or such other judge as the plan may provide. In locating ultimate responsibility in the hands of the district judge, the bill clearly resolves all doubt about the locus of final supervisory authority over the day-to-day operation of the selection system."). The failure to collect race/ethnicity data when omitted, the failure to compile the data as required, and the failure to regularly review the representativeness of the jury wheels has resulted in a complete breakdown in the regular oversight of the jury selection process envisioned by the Jury Act and the Judicial Conference. These are additional, substantial violations of the Jury Act.

**V.     The Southern District's Exclusive Use of a Juror Source List That Substantially and Persistently Underrepresents African-American and Hispanic Citizens Violates the Jury Act, the Equal Protection Component of the Fifth Amendment, and the Fair Cross Section Guarantee of the Sixth Amendment.**

The Jury Act states "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district . . . wherein the court convenes." 28 U.S.C. § 1861. This policy is based on the Sixth Amendment's guarantee that "the accused shall enjoy the right to a . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. CONST. amend. VI. The Southern District has found that, "the persons whose names appear on the registered voter lists represent a fair cross section of the community in the Southern District of California." Local Civil Rule 83.10(c)(4).[16] But in order for this finding to have a basis in fact, the jury-eligible population of San Diego and Imperial Counties must be represented on the registered voter lists in substantially the same proportions as they are found in the communities of the Southern District. Unfortunately, this is not so.

---

[16] The Local Rules' "finding" does not appear to have been based on any empirical data or facts before the Court.

### a. African-American and Hispanic citizens in California are substantially underrepresented on registered voter lists.

According to the U.S. Census Bureau, since at least the November 1998 election and continuing through the November 2008 election, African-Americans and Hispanics have been underrepresented on the registered voter lists in California compared to non-Hispanic whites. The following chart shows the percentage of age-eligible, citizens for each group that are registered to vote:

**Table 3.**

| Year[17] | % Eligible **non-Hispanic Whites** Who are Registered to Vote | % Eligible **non-Hispanic African-Americans** Who are Registered to Vote | Absolute disparity between African-American and non-Hispanic White registration rates | % Eligible **Hispanics** Who are Registered to Vote | Absolute disparity between Hispanic and non-Hispanic White registration rates |
|---|---|---|---|---|---|
| Nov. 1998 | 69.4 | 64 | **-5.4%** | 55.5 | **-13.9 %** |
| Nov. 2000 | 70.9 | 64.9 | **-6%** | 55 | **-15.9 %** |
| Nov. 2002 | 67.2 | 55.9 | **-11.3%** | 50.8 | **-16.4 %** |
| Nov. 2004 | 76.2 | 73 | **-3.2%** | 55.4 | **-20.8 %** |
| Nov. 2006 | 70.6 | 52.9 | **-17.7%** | 53.1 | **-17.5 %** |
| Nov. 2008 | 72.9 | 67.1 | **-5.8%** | 62.8 | **-10.1%** |

---

[17] U.S. Census Bureau, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin, for States: November 1998*, http://www.census.gov/population/socdemo/voting/cps1998/tab04.txt; *November 2000*, http://www.census.gov/population/socdemo/voting/p20-542/tab04a.pdf; *November 2002*, http://www.census.gov/population/socdemo/voting/p20-552/tab04a.pdf; *November 2004*, Table 4a, http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2004/tables.html; *November 2006*, Table 4b, http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2006/tables.html; *November 2008*, Table 4b, http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2008/tables.html (last visited January 5, 2012).

54

This persistent underrepresentation of eligible African-American and Hispanic citizens compared to eligible, non-Hispanic white citizens on California's voter registration lists renders these lists an unrepresentative subset of the population in California. The Government has never disputed the unrepresentative nature of the Southern District's source lists.

In enacting 28 U.S.C. § 1863(b)(2), Congress considered the situation where -- as here -- the registered voter lists do not adequately capture the jury-eligible community. In the House Report accompanying the Jury Act, Congress stated that "any substantial percentage deviations must be corrected by the use of supplemental sources." H.R. Rep. No. 90-1076, at 3 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1794. The percentage deviations in the registration rates of eligible African-Americans compared to eligible non-Hispanic whites (from a low of 3.2% to a high of 17.7%) and of eligible Hispanics compared to eligible non-Hispanic whites (from a low of 10.1% to a high of 20.8%) are "substantial percentage deviations [that] must be corrected." *Id.* The Southern District's failure to correct these "substantial percentage deviations" violates 28 U.S.C. § 1863(b)(2), which states that "[t]he plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of [the Jury Act]."

55

**b.     A substantial portion of the voting eligible population of San Diego and Imperial Counties has not been registered to vote from at least 2000 and continuing through 2010.**

Both the Jury Act and the Southern District's Jury Selection Plan assert that all citizens *shall* have the opportunity to be considered for grand and petit jury service. 28 U.S.C. § 1861; Local Civil Rule 83.10(b).  But a substantial portion of eligible voters in San Diego and Imperial Counties are not registered, and thus would never have the opportunity to be considered for service on federal juries.  According to the Secretary of the State of California, Elections Division, the following are the registration rates of "eligible" persons in the counties comprising the Southern District from 2000 to 2010:[18]

---

[18]  These are the registration rates of the eligible voters in each county for the general election years as of the 15-day close of registration (except for 2000 which had a 29-day close for registration).  California Secretary of State, Elections Division, *V o t e r   R e g i s t r a t i o n   a n d   P a r t i c i p a t i o n   S t a t i s t i c s ,* http://www.sos.ca.gov/elections/elections_u.htm (last visited January 5, 2012).

**Table 4.**

| Year | % of "Eligible" Population in San Diego County who are Registered to Vote | % of "Eligible" Population in Imperial County who are Registered to Vote |
|---|---|---|
| October 10, 2000 | 71.46 | 74.21 |
| October 21, 2002 | 73.91 | 68.06 |
| October 18, 2004 | 76.96 | 69.61 |
| October 23, 2006 | 69.38 | 62.58 |
| October 20, 2008 | 72.52 | 65.02 |
| October 18, 2010 | 68.69 | 58.53 |

From 23.04% to 31.31% of the "eligible" population in San Diego County and from 25.79% to 41.47% of the "eligible" population in Imperial County has not been registered to vote since 2000 and would thus never be found on the registered voter lists. The Government has never disputed that a substantial portion of the eligible population in the Southern District is not registered to vote and thus would never be considered for federal jury service.

57

i. **Given our Nation's history of discrimination against minorities in the voting process, one cannot equate failure to register to vote with a failure to be engaged -- or desire to be engaged -- in civic life.**

Our Nation has a history of discrimination against racial and ethnic minorities, both in the registration of eligible voters as well as in their attempts to exercise their right to vote at the polls. In fact, the very concept of a required "personal registration" prior to one being able to exercise the right to vote was born in an attempt to restrict the vote -- and it has been quite successful.[19] In the passage of the Voting Rights Act of 1965, Congress detailed the history of its attempts to actually deliver on the "fundamental principal that the right to vote shall not be denied or abridged by the States or the Federal Government on account of race or color." H.R. Rep. No. 89-439, at 3 (1965), *reprinted in* 1965 U.S.C.C.A.N 2437, 2439-40.

In 1993, Congress passed the National Voter Registration Act (42 U.S.C. §§ 1973gg-1 to gg-10), noting that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in

---

[19] C. Williams, *Jury Source Representativeness and the Use of Voter Registration Lists*, 65 NYU L. REV. 590, 618-21 (1990) (discussing the history of voter registration in America).

elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C. § 1973gg(a)(3).

Unfortunately, California has experienced difficulty both in processing registrations received through the National Voter Registration Act and in simply complying with the requirements of the Act. *See 'Motor Voter' Program Broke Down*, L.A. Times, June 23, 2001, at A-11 (the Federal Election Commission "received hundreds of calls from voters who said they went to polls in November only to be told they couldn't vote because motor vehicle offices never sent their registration forms to election officials") and Douglas R. Hess & Scott Novakowski, *Unequal Access: Neglecting the National Voter Registration Act 1995-2007* (February 2008), *a      v      a      i      l      a      b      l      e          a      t* http://www.projectvote.org/images/publications/Policy%20Reports%20and%20Guides/Unequal_Access_Final.pdf (last visited January 6, 2012) (detailing the failure of a significant number of states -- including California -- to register eligible citizens at "public assistance" agencies as required). Because of these persistent problems with voter registration in California, the failure of Southern District citizens to register to vote cannot be equated with a failure to be involved in civic life.

59

**c.** **The Ninth Circuit's Jury Trial Imrovement Committee recommended supplementation of jury source lists because jury-eligible citizens are underregistered to vote and because voter registration lists are not representative of the community.**

Both of the problems described above:

(1) unrepresentative voter registration lists; and

(2) underregistration of eligible voters

were cited in the Ninth Circuit's Jury Trial Improvement Committee's 2004 inaugural report recommending that district courts supplement their source lists by including drivers license and state identification lists.  Ninth Circuit Report at 3-4 (May 2004); ER 587-88.  The benefits of this recommendation are evident in the results of a pilot project in the Eastern District of California.

On February 22, 2007, the Judicial Council of the Ninth Circuit approved the Eastern District of California, Fresno Division's Pilot Project to draw jurors from both the voter registration lists and Department of Motor Vehicle Records.  ER 596-601. This pilot project provides a unique opportunity to see representativeness in a California federal court when jurors are drawn solely from voter registration lists compared with when they are drawn from both voters and DMV lists.  By comparing AO-12's in the Fresno Division from before the Pilot Project with those during the Pilot Project, one can see how supplementation has broadened the opportunities for

60

federal jury service as well as increased representativeness and reduced disparity on the master and qualified jury wheels.

Before the Fresno Division started supplementing their source list with DMV Records, the percentage of Hispanics on their master wheel ranged from a high of 18.73% in 2005 to a low of 11.90% in 2001. *See Report on Operation of the Jury Selection Plan, Eastern District of California, Fresno Division,* 2001 to 2006; ER 608-19.

**Table 5.**

|  | **2006** | **2005** | **2004** | **2003** | **2002** | **2001** |
|---|---|---|---|---|---|---|
| Hispanics on Master Wheel - ***Voter Lists Alone*** | 17.98 % | 18.73 % | 18.63 % | 17.64 % | 13.73 % | 11.90 % |

After the Fresno Division started supplementing with DMV Records, the representation of Hispanics on the master wheel shot up immediately:

**Table 6.**

|  | **2009** | **2008** | **2007** |
|---|---|---|---|
| Hispanics on Master Wheel - ***Voter Lists Supplemented with DMV Records*** | 26.23 % | 27.11 % | 23.50 % |

61

*See Report on Operation of the Jury Selection Plan, Eastern District of California, Fresno Division,* 2007 to 2009; ER 602-07. As the tables above show, supplementing the voter registration lists with the DMV Records in the Fresno Division has resulted in the representation of Hispanics on the master wheel approaching the actual representation of Hispanics in that community (the percentage of Hispanics in that community is calculated by that court as 26.3%).

> **d.  Failure to supplement unrepresentative source lists violates not only the Jury Act but the Fifth and Sixth Amendments as well.**

Exclusive reliance on unrepresentative source lists offends not only the Jury Act but also the fair cross section (U.S. CONST. amend. VI. ) and equal protection (U.S. CONST. amend. V.) guarantees of the Constitution. Mr. Hernandez-Estrada attempted to extensively litigate his constitutional claims below. But, the clerk's office's failure to keep reliable data on jury wheel demographics made it impossible for him to make the necessary showing of underrepresentation. *See supra* Section III.

For his Fifth Amendment claim, Mr. Hernandez-Estrada must show: (1) that African-Americans and Hispanics are "recognizable, distinct" classes; (2) that they are underrepresented when "comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period

62

of time;" and (3) that there has been "purposeful discrimination." *Castaneda v. Partida,* 430 U.S. 482, 493-94 (1977).

To show a Sixth Amendment violation, Mr. Hernandez-Estrada needs to demonstrate that: (1) Hispanics and African-Americans are "'distinctive' group[s] in the community; (2) that the representation of [Hispanics and African-Americans] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

### i. Hispanics and African-Americans are "recognizable and distinct" and "'distinctive' group[s] in the community."

Mr. Hernandez-Estrada meets the first prong of both tests, in that Hispanics and African-Americans are "recognizable and distinct" and "'distinctive' group[s] in the community." *See United States v. Sanchez-Lopez*, 879 F.2d 541, 547 (9th Cir. 1989) (*citing Castaneda v. Partida,* 430 U.S. 482, 495 (1977)) and *United States v. Cannady*, 54 F.3d 544, 547 (9th Cir. 1995) (citations omitted).

### ii. The failure to collect reliable race/ethnicity data makes it impossible for this Court to evaluate the second prong.

Working with the only existing demographic data, Mr. Hernandez-Estrada presented expert evidence comparing the representation of Hispanics and African-Americans on the jury wheels with those in the community over the last decade. ER 485-515. But, as to the second prong, the district court found Mr. Hernandez-Estrada's claims failed. ER 5.[20] Using the faulty calculations described above in Section III(d), the district court curiously found that Hispanic citizens are actually overrepresented on the jury wheels. ER 5. The court also found that the persistent underrepresentation of African-Americans on Southern District jury wheels was constitutionally permissible.[21] ER 5 & 23.

---

[20] This Court must determine the "total population" for purposes of the Fifth Amendment analysis and the "community" for purposes of the Sixth Amendment analysis. But this Court's case law has treated these comparison groups as identical for either constitutional challenge.

[21] This is unfortunately a product of this Court's current benchmark for disparity articulated almost thirty years ago in *United States v. Suttiswad,* 696 F.2d 645, 648 (9th Cir. 1982), that essentially allows even the complete exclusion of minority groups that makeup less than 7.7% of the community. *See Hirst v. Gertzen*, 676 F.2d 1252, 1258 n.14 (9th Cir. 1982) ("Where the cognizable group involved in the jury challenge represents a small percentage of the population, the [comparative disparity] method of comparison is the more informative. Since the group in question makes up a relatively small percentage of the population, the

The failure of the clerk's office to compile the required data has created a situation where this Court is without reliable information to evaluate the second prong of Mr. Hernandez-Estrada's claims. He should not be penalized for the failure of the clerk's office to follow the command of the Jury Act.

It has *never been disputed* that the source lists used by the Southern District persistently and significantly underrepresent African-American and Hispanic citizens. It has also *never been disputed* that the qualification process using the legally incorrect English proficiency standard results in the disproportionate disqualification of Hispanic citizens. Ten years of data have been presented to support Mr. Hernandez-Estrada's Jury Act and constitutional claims. These facts should not be so easily defeated through the Southern District's failure to collect reliable data and faulty math. It's past time for "all citizens [to] have the opportunity to be considered for service on grand and petit juries in the [Southern District]" and for "litigants in [the Southern District] entitled to trial by jury [to] have the right to grand and petit juries selected at random from a fair cross section of the community." 28 U.S.C. § 1861.

---

'absolute' disparity between the percentage of the group in the population and the percentage on the jury venire will always be small, even where the group has essentially been eliminated during the selection process.").

## CONCLUSION

There are only five bases for disqualification permitted by the Jury Act. 28 U.S.C. § 1865(b)(1)-(5). The Southern District is improperly screening on two of those five. The result is that the master wheel -- already created from indisputably unrepresentative voter registration lists -- becomes even less representative at the qualified stage. The Southern District is also failing to diligently collect, compile, and monitor data on the representativeness of its jury wheels in violation of the Jury Act and so underrepresentation of African-American and Hispanic citizens has gone unchecked and unremedied for over a decade. A substantial violation has been shown.

Mr. Hernandez-Estrada requests this Court vacate his conviction and remand his case to the district court with direction that the indictment against him be dismissed for these violations of the Jury Selection and Service Act of 1968, the equal

protection component of the Fifth Amendment, and the fair cross section requirement of the Sixth Amendment.

Respectfully submitted,

*/s/ Michele Akemi McKenzie*

DATED: January 17, 2012    **MICHELE AKEMI MCKENZIE**
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101-5097
(619) 234-8467
Attorneys for Defendant-Appellant

67

## CERTIFICATE OF RELATED CASES

Counsel is unaware of any related appeals pending before this Court.

Respectfully submitted,

*/s/ Michele Akemi McKenzie*

DATED: January 17, 2012      **MICHELE AKEMI MCKENZIE**
Federal Defenders of San Diego, Inc.
225 Broadway , Suite 900
San Diego, CA 92101-5097
(619) 234-8467
Attorneys for Defendant-Appellant

68

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C)AND
CIRCUIT RULE 32-1 FOR CASE NUMBER 11-50417

I certify that:  (**check appropriate options(s)**)

_X_  1.       Pursuant to Fed. R. App. P. 32(a)(7)(C)and Ninth Circuit
             Rule 32-1, the attached opening/answering/cross reply
             brief is

    _X_   Proportionately spaced, has a typeface of 14 points or more and
          contains_13,934__ words (opening, answering, and the second and
          third briefs filed in cross-appeals must **NOT** exceed 14,000 words;
          reply briefs must **NOT** exceed 7,000 words),


_January 17, 2012_                  *s/ Michele A. McKenzie*_____
       Date                          MICHELE A. MCKENZIE
                                     Signature of Filing Party


69